The next case for argument is 22-1599, Alexsam v. Cigna Corporation This case is 22-1599, Alexsam v. Cigna Corporation We're going to be covering some of the same ground discussed a few minutes ago in the companion case number 22-1598. Alexsam maintains the same position on those overlapping issues here as we did there. For efficiency, I will try not to repeat those arguments unless necessary or the court would like me to. In this appeal, the District Court for the Eastern District of Texas erred when it found that the claim term unmodified point-of-sale device had been construed in IDT to require Alexsam to prove whether any POS terminal had been modified at all, not whether the terminals used in the accused system were solely modified for the purpose of being used in the card system. The magistrate's finding is not supported by this court's holding in Alexsam v. IDT and is irreconcilable with the disclosures, teachings, and comments made by the inventor in the specification and in the prosecution history. First, the holding in IDT clearly states at page 1342 that Alexsam had failed to present substantial evidence in that case that the POS devices in the accused systems had not been reprogrammed, customized, or otherwise altered with respect to their software for use in the card system. Can I just cut a little bit of this out? If the District Court met any kind of modifications, including those modifications we were talking about from a swipe to an insert to a tap, then maybe you have some argument there, but that's not what this keyed on, right? That's not the modifications that we're talking about. We're talking about the same kind of modifications. Were there modifications required to specifically use Cigna cards? And I can't remember the facts of this one specifically. Your friend will tell me. Were there specific modifications required to use Cigna cards or not? The answer to your question is no, at all. It's a debit card. There's no modifications. You just swipe it at your debit card, credit card term. And related to that, correct me if I'm wrong. My recollection is that a difference between the case we just heard argument in and this one is that in this one, the defendants have not identified any modifications that they have made, so we have a, we do not know what's on the target to be thinking about concretely. Is that correct? That is a fair statement. Did you identify, I mean, so the problem for you all in IDT was you just posited, well, these are just Visa cards or whatever they said there, so they work without modification. Did you go beyond that and have specific expert testimony saying something different than that? Yes, we did. So the defects that were identified in IDT was a lack of foundation, that is they didn't look at what was going on in the system, a lack of expertise by the purported experts there, and failing to reach the ultimate question about whether there was actually an unmodified POSU. In our case, we've solved all three of those, but with a specific response to your question, we did. We talked to an important witness to this, which is the intermediary, which is identified in IDT as having been missing there. The intermediary here is a company named Allegis, and they are the company that's responsible for receiving the card data and the transactions involving the card data. And what's important here also is that Claim 32 looks to what was received from the POS device. It directs us at 32B, paragraph 32B. It directs us to a transaction processor that's receiving from the POS device. So when we look to and we depose Mr. Holmes, who worked with Allegis, we are talking to the company that is receiving the card data, and he tells us. Before we get into what he tells us, can I ask you a process question? Where is the transcript in the appendix? You cite Mr. Holmes' testimony, and you cite to pages in the transcript that I can't find in the appendix. Your Honor, I apologize. As I meant to say earlier, there is an error that we intend to correct, and that is to provide some missing pages that, due to a compilation error, some pages were inserted instead of some of the key pages. However, all of the key evidence is quoted in our brief, and it's not challenged as being inaccurate in any way, and we'd like to correct the record so that you can have those missing three pages. When I say missing three pages, it's a panel of compressed pages. Well, you're required to have it. I mean, it's not whether you'd like it or not. It's not discretionary. If you're going to cite transfer pages in the briefs, you're supposed to include those in the appendix. We intend to move to substitute those pages immediately after the hearing, and I apologize. However, the content of those pages is faithfully dictated in the brief, particularly with respect to the gray brief that I can provide citations to. But fundamentally, Judge Hughes, to answer your question, these are debit cards. You use them at a debit card terminal, at your doctor's office, at your CVS store, at your pharmacy, whatever it is. There isn't any modifications that's required. It uses standard ISO standard, which are international standards, organization standards, 7813, which relates to the card that contains the information, the BIN, and 8583, which is the messaging standard for financial transactions. And all of this evidence is presented here and was not presented at all in IDT. But more importantly, it addresses the issues that IDT spotted with respect to, as I said, lack of foundation, a lack of expertise, and a failure to reach the ultimate question. So in this case, we have a very different circumstance. But respectfully, I also believe that the magistrate judge below actually did find that any modifications, in fact, that's the language he used, that any modifications would cause the devices to fall outside the claims and that he employed that misunderstanding to the facts of that case. And that's why summary judgment should be reversed and the matter remanded there, is that he erroneously believed by reading the factual recital that that was the holding of the court when the holding of the court actually did not dispense with the language for use in the card system. And I'm confident that Mr. Bonilla agrees with all of us that not any modifications are disqualifying. But he stated the correct standard elsewhere, right? You know, why can't we, I don't know what the right word is, but why can't we kind of ignore that and say it was just short term? He definitely recited the correct standard. Reciting it and applying it differ wildly here. At page 12, which is Appendix 0112, which is Volume 1, the magistrate judge says, at no point did Mr. Zatkovich's report or Mr. Holmes, Mr. Holmes is from the Appellegis, deposition, did either one offer any evidence, quote, whether modifications have in fact been made for any reason, close quote, to the POS terminals. So he may have occasionally, at points rather, recited, but he did not understand or apply the correct claim construction. And that's a fundamental issue with the Cigna case. The evidence is clear that this is the generic debit card. This is not anything that requires anything special, and the evidence establishes that. But equally important, the construction that was adopted by the magistrate is incorrect, but it was done without notice as well. And that does run afoul of this court's precedent, that this was done sua sponte. It was not an issue. These were not arguments that were advanced by the parties during briefing, although their contrasting understandings were set out. The claim construction issues were not briefed. They were not argued, and they were decided by the judge himself. And again, it just doesn't comport with the intrinsic evidence. And this is important for both companion cases. Can I ask you about just you mentioned the expert Zakovich? Zakovich. Okay. He said – I read his testimony as being kind of analogous to what went down in IDT and why the testimony was found inadequate because he kind of said it doesn't need to be modified, but that doesn't really answer the question about whether, in fact, it was modified. And that sort of rings a little similar to what we said in IDT. Well, the issue of needing to be modified goes more to Judge Hughes' question about the generics of it, and it certainly is relevant. It's not dispositive, and he doesn't rely solely on that fact. He relies on the foundational facts, those probative facts that were missing in IDT, and that's what was actually happening in the system. And he says based on that, that is, those probative facts that were absent from IDT, that that was sufficient for him to be able to determine that the POS device was unmodified for use in the card system. And the primary argument here I think misapprehends the full scope of IDT when its recitals are being used as holdings of the court. One of the key points that I'd like to not let me miss before we get too far along in the IDT case has to do with some of the language that is being used here in several— Did he specifically identify any unmodified terminals that use the Cigna cards? All terminals that were—the data for which Allegius received data. So all terminals that Allegius received data from were unmodified. Is that a yes or a no to Judge Hughes' question? I believe that's a yes. That is correct. You are correct. He did. I mean, what about the quotation from him on page 113 of the appendix in the matter should judge decisions? I mean, the answer is do I approve if any of the thousands of cards and hundreds of thousands of transactions that occurred actually occurred at an unmodified standard retail point-of-sale device? No, I have no personal knowledge of that. Yes, Your Honor. That is taken out of context. The full context would have you focus on the exact language that was— the questions and the answers that preceded that. I guess I sort of understood him to be making a standard expert point. Experts under Rule 701, 702, 703 are allowed to testify not on the basis of anything they have personal knowledge of. Matters of personal knowledge are under Rule 601, 602, et cetera. The point of having a whole separate section in the Rules of Evidence is that the requirement of personal knowledge is not required. So of course the expert would say, I don't have any personal knowledge. That's correct. I didn't see it with my own eyes. That's correct. And in the passages preceding that to amplify on that, he actually identifies the evidence that he's relying on in the case. He makes the distinction in that passage that he— exactly, that he doesn't have personal knowledge. Can I ask this? And this is not going to be a well-formed question at all. Sure. I'm trying to understand how much of your current— your argument in this case depends on or might differ from in terms of what you need in order to win the claim construction dispute that we were just arguing about in the previous case. Now suppose I disagreed with you that this unmodified language is a reference to going outside the overall system that's being used from point of sale up through various processing stations. And suppose I were thinking that what matters is whether the software or the hardware at the store has been modified so as to enable the card to be read. Never mind what happens to the information sucked off it when it is read. Is your argument here about what should have happened on summary judgment— do you lose here without your outside the system— I'm using that as a shorthand. I hope you understand. I understand your point. You're outside the system construction or might you prevail here on a narrower view having to do with the readability at the point of sale? The answer is let's ignore the off the system element. Let's look at the focus on the for use in the card system. Here there are no modifications alleged. It occurs over the banking network. We win here if you determine that the proper construction is not any modifications. And we win here if you decide that if it treats it like a generic card that that infringes or that meets the limitation. We win there. The issue in the companion case— I wish I had been more articulate in explaining what the issue is. The issue there is whether the modifications are for use in the card system or whether they are for use of the system. So, for example, if I have to—I think I'm out of time. May I finish my— You may even be out of case. Well, I hope that's certainly not true.  Thank you, Your Honor. Thank you. May it please the Court? Federal Circuit decisions have consequences. I heard Mr. Hoffman say that. So, too, do a litigant's actions. Let me just get to this claim construction. I think you were here for the last one. You heard what we were talking about. Do you think the district court went further here than the distinction between what I'm calling probably imprecisely generic versus tailored modifications? Or do you believe that he really was just focusing on tailored modifications and they still didn't prove that there were no tailored modifications? It's the latter, Your Honor. And we know that because we can take a look, for example, in the gray brief at page 7. They cite to appendix page 109 where Judge Payne says, therefore, any modification to the software or hardware that impacts how the POS device would be used in the card system would fall outside the scope of the claims. So he understood that what we were talking about is use in the card system. And if I could use an analogy, I think it would help. This is all so imprecise because we keep using the word in the card system, and I'm not sure that we understand if in the card system means the specific card system or the specific brand of cards or the general card system we all use to implement every kind of card. And I don't know if I'm being precise enough about that. I can't say it any more clearly than I have. But the example that I was trying to use about switching from a swipe to an insert to a tap, that's not implicated by unmodified, right? With those, okay, it looks like you're going to say a different thing, which is where you're going to start to worry me because those are not modifications that were designed specifically to implement a tailored, the specific card you have. They're just modifications that have been made in every type of POS device, whether it was for this card system or not. So in your view, do those modifications bring it outside the pattern? They do, but not because of the modified portion of the construction. Remember, there's two things this construction has. It has to be POS devices of the type in use as of July 10, 1997, and not modified with respect to its software or hardware. And so if we're talking about upgrades or updates, that's not of the type as of 1997. Has that really ever been an issue? It has. I mean, I thought that of the type just meant these are the kind of POS systems they have, not any kind of slight or even major technological development brings them out. I mean, who would write a patent that says we only infringe in this kind of field that something that happened in 1997 knowing that things are going to change and get better? Because what they're trying to patent is not the terminal. They're trying to patent the idea of using a multifunction card without any specialized programming. But the claim language says unmodified existing standard. I don't want to talk about that. I mean, I don't think that's how the district court decided this case. And if he did, I think he might be wrong. Can I move you to the – I'm sorry, you, Jim? Yes. The Zakovich, which you talked about a little, and Holmes. What was missing in what these two experts are talking about? So Zakovich was the plaintiff's expert, and Mr. Holmes is the allegiance representative. And Holmes was a fact witness. Correct, Your Honor. And Zakovich was not. Correct, Your Honor. And Holmes was asked if any modifications were required to point-of-sale devices before allegiance could process data received from those devices. And he said, no, there's no modifications required. But that's exactly the evidence they provided in IDT that this court rejected. So to continue to say the reason we know the devices were unmodified is because we receive existing standard data, standard data being the data required by the ISO standards. That tells us the device was not modified. The IDT court already rejected that. This court already rejected that. And so the analogy I want to give specifically to you, Judge Hughes, because I know that you've been kind of going over this issue, is what is a modification for the use in the card system and what is not? So the analogy I'll use is if you're going to Walgreens, for example. You go to Walgreens to use a Cigna CDHP card, which you can only use for medical purchases. So it is limited. It's not multifunction. You can only use it that way. You go to Walgreens, and when you come up to the point-of-sale device and you swipe it or stick it in or tap it, whatever it is, it may have a sticker on it that says Walgreens. You've now modified the hardware. You've put a sticker on it. It may be branded Walgreens in the user interface. You've modified the software. But that's not for use in the card system. That doesn't change anything. That said, when you swipe that card, if you have a Walgreens account, you can type in your phone number, and it may apply rewards. It may change the purchase price. It may change the information that is sent from the point-of-sale device. That's a modification that would arguably be for use in the card system. The problem in the Cigna case, in this case, is nobody knows where these cards were used. There is Mr. Zatkovich, and I like Sam. So you're basically saying it's the same failure proof that was in IDT, despite what your friend says is the additional evidence from the processor, because we don't know if there is other functions that it may have been some of these functions were the same, but all these other functions that make it a multi-function card might have required modifications. But you don't like, in the last case, have specific examples of modifications that actually were necessary. I understand it's not your burden, so you don't have to come up with them, but those are the kind of modifications about how you had to do these specific steps to activate a gift card that seemed like modifications for use in the card system. You're saying theoretically that's possible here, and they didn't disprove those. That's right. I guess with going back to the Holmes testimony, where he testifies the devices in the IQ system transmit standardized fields and data, but your view would be that that's insufficient, because that doesn't establish they were entirely unmodified for use in the card system. Correct, Your Honor, and that's what this court told him was in IDT. And we know that Alexan knows that too, because when we first made our motion for summary judgment, their response isn't what you've heard today, isn't what was in the briefing. Their response was the IDT court was wrong. They said the IDT court, the Federal Circuit… But they fixed that up eventually before the… Eventually they walked that back. They did walk that back. But why was that their initial response? Because they know that if IDT applies, they lose. They have the same evidence. Are we supposed to decide the case on the basis of an inference about what they must know? No, Your Honor, of course not. This court can decide the case by simply… They had insufficient evidence of the nonexistence of modifications for use in the system, or they didn't. And this is a case unlike the last where the defendant, you, identified not a single modification for them to say here's why that isn't enough or something. No, Your Honor, we did not identify modifications because, as has been mentioned, it wasn't our burden. But also they didn't identify any proof of non-modification. Their whole argument, just like it was in IDT, is that these devices follow the standards. And because they follow the standards, the point-of-sale device doesn't have to be modified. Mr. Zakibitz didn't say it in this case, but in the Simon case he said, I don't have to look at the point-of-sale device. I don't have to review it because it doesn't matter as long as it provides standard data. Is this back to the same kind of IDT stuff that because it uses the standard system, that means it's hypothetically possible of operating without modification, but we don't know if there's actually any specific operation without modification? Yeah, we don't know. There is no evidence to… And all he has said is because it uses these standard things, it can operate, but not that it does operate. Yes, and that, in his opinion, that it did operate in that way. But when I asked him, and this is the quote that we discussed. Are you talking about Holmes or Zakibitz? Zakibitz. Okay. Mr. Holmes, the only thing he said was that Allegis expects to receive standard data. Not that it actually did. There is not a single piece of evidence about any of the transactions over the relevant period, 2014 to 2017, showing that any of Cigna's cards were ever used at a point-of-sale device that was, in fact, unmodified. That's a different thing. Do I understand it right that Mr. Holmes, he's on the receiving end, and he's getting working data from working cards on a regular basis, right? And it must be standard data. It is standard data, correct, Your Honor. Okay, so there's plenty of evidence of that. Plenty meaning sufficient. It's from the recipient. The only question is whether there's simply a lack of evidence of something additional having been changed down at the Walgreens, in the device at the Walgreens. Correct, Your Honor. But that's what this court addressed in IDT. In that case, their expert's name was Baker. And Mr. Baker said, well, these devices operate using standards, these ISO standards. They receive standardized data. And because they receive standardized data, then the point-of-sale devices are not modified. And this court said, no, that's insufficient. You have to actually show both things, that the point-of-sale devices were of the type in use as of July of 1997 and unmodified. I assume there was discovery preceding the summary judgment. Yes, Your Honor. And was a question put to you all, please identify any modifications that were made in point-of-sale devices being used in the use of these cards? Yes, Your Honor. And you answered? We answered that we don't know because Cigna doesn't actually process these cards or build or maintain point-of-sale devices. Who would know that? It would be the manufacturers of point-of-sale devices or the retail stores themselves. Even Allegis doesn't know because, again, it doesn't care whether the devices are modified or not. It just cares whether the data is standardized. So Allegis wouldn't even know what happens at the point-of-sale device. So there is someone, I don't mean a human being, but including a human being I certainly mean, that might have known and could have been discovered in discovery. That certainly exists. Yes, Your Honor. There's somebody who could have said it, but they didn't reach for that information. All they did was they went to Allegis and said, do you require modifications to point-of-sale devices? No, we don't require them. And they said that's enough. Could modified point-of-sale devices still deliver this standard information? Absolutely. Yeah, because they have to operate within the standards. If you're going to send information to a payment processor, you have to use these ISO standards so it knows what to get. Your point is the fact that their witnesses and the Allegis people say we've received standard information doesn't inexorably lead to the conclusion that all the devices or some of them were unmodified, that that's just a different question. That's right, Your Honor. I'm sure that if Mr. Hoffman were back up here and you were to ask him about these modifications made for activation, could those devices also receive payment if you're at a Nordstrom rack or something? Could they also receive payment in addition to activating gift cards? Sure, because they would send standard data. But the fact that they send standard data, or more accurately, that Allegis receives standard data is insufficient. I was asking you a minute ago about discovery questions or interrogatories or whatever the form was to you about – is any of that in the joint appendix that we have? It is, Your Honor. I don't have it off the top of my head. But I can tell you that if you look in the red brief – excuse me, the blue brief – that Alex Sam mentions our interrogatory responses and how in May of 2021 we responded to an interrogatory asking us for our bases for non-infringement. And in that response, we explained that under the IDT holding, they had a lack of evidence. This was close to the end of discovery. So if you give me a moment, I can actually point you to where that is. That's not actually the point I'm interested in. It may be the document I'm interested in. I'm interested – it makes a big difference intuitively to me whether – what to make of the fact that you didn't identify a single modification of the point-of-sales device. It makes a big difference intuitively whether that's knowledge you would have or wouldn't have. If you would have it and you didn't identify it, you're not in as good a position as you might be in if you said, I'm not identifying anything because how would we know? That's the distinction I'm interested in. Yeah, and Your Honor, I'll tell you, if we had that information and could have provided it, I mean it would have been very helpful for our case, certainly. But we didn't. Cigna doesn't process these cards. What they provide – But Judge Toronto is asking if in any of your responses in the discovery process you indicated that to either the court or the other side. So we did in our interrogatory response. There is a request for an explanation of any modifications, and we said we don't know that information because we don't maintain these devices. We don't maintain these processes. We hire Allegis to provide this information, and they asked Allegis, and all Allegis could say is we expect to receive standard data. That is what we process. So, Your Honor, it's for these reasons, as Mr. Hoffman said, and I will reiterate, Federal Circuit opinions have consequences. The IDT holding in this case applies, and applying that holding means that this case should be affirmed. Thank you. You exhausted all of your rebuttal time. We'll restore three minutes. Thank you, Your Honor.  One, I believe the – at least the third supplemental objections and responses to Alexander's first set of interrogatories is found at 1389. This is in Volume 2. With what your friend is saying that they – you were aware that they would have had that information about the modifications and that you were aware of that? Your Honor, they would have had access to that information, of course, because if their products actually required something special, they would need to be telling the retailers that, and they would be aware of that, and they do not, and they were not able to identify any modifications because there were not any. This treated the card, which is a multifunction card because it is a debit medical services card, and by virtue of its use of the dual or two databases that are set forth in Paragraph 32D of the independent claim, that does satisfy, obviously, the multifunction card element. With respect to the sufficiency of the evidence, I entirely disagree with the characterization of the evidence. It is not simply that the same recycled evidence from IDT. We have an IDT. We had no expert. We have an expert here. Yeah, but I'm going to just what Mr. Holmes argued. He was arguing about the accused system transmits standardized fields and data, and what's the link between that observation and the conclusion that, therefore, they're entirely unmodified? Because if this is the unique versus generic argument, the question is, are there any changes that are made in order to allow the processor – think of the processor as allegiance or actually think of it as Mr. Dorff – are there any changes that have been made to allow me to receive that, that is, for use in my card system? And the answer is no if I'm receiving this BIN-directed communication, that is, an addressing scheme, with the standard financial transaction information packets, which is the 8583 standard. If I'm using both of those and I have received it, it is unmodified to reach me. It is, therefore, unmodified for use in the card system. One way that I guess I was translating or understanding Mr. Bonilla's account of that testimony is that all of that may be quite right as a description of what allegiance receives, but that doesn't preclude allegiance from receiving something additional. The additional reflecting a modification at the point-of-sale end. And that Holmes didn't say, we don't receive anything additional. Is there something wrong with that translation? Yes. They may receive something additional. It doesn't matter because the use of the card system is to process these claim transactions and that we know that information is in these standardized formats. So it is not that there may be other modifications for other purposes is irrelevant to the claim. It doesn't matter. All that matters is a... I'm not clear. Wouldn't any modified... They could have a modified SIS device that would transmit different fields and different data. No. If you're using a... Correct. Correct. If you're using a BIN, though, which is what the patent teaches, and it's over the banking network and it includes the data that we've been talking about, it's unmodified to reach Mr. Dorff's system. That's what we're talking about. Are there modifications... So at least part of the information is unmodified, but isn't that still the problem, the same IDT problem, that that part of it is sufficient to show that it is capable of receiving information from an unmodified system, but it doesn't say that there are other parts of the system that are modified or not and whether that impacts it. I mean, it's not all or nothing, right? You could have a modified system that still transmits standard information. If you're transmitting standard information, it is not modified for the purposes of the 608 patent. But there could be different data in the field. There could be other modifications. Rather than standardized, and we don't know that. Nothing that Mr. Holmes told us rules that out. But it's not relevant to the use in the card system, which is what are you relying on to direct yourself... with this specific transmission of information, not the multifunction card system, which could have transmission applications and all other kinds of things too. Let me see if I can understand your point. I want to go back to your generic versus unique. If you are processing this via a generic transaction where you swipe the card and it's directed to the processor, you are practicing the patent. If there's some modification to that so that you're not using the BIN and you're not... Even if the card also has other functionality and the point-of-sale device has been modified to use so that it can have that other multi-card functionality? Exactly. So think of, for example, if you had... That doesn't sound like it's consistent with your claim construction. Well, it is because it's not for use in the card system. For use in the card system is to, in this case, there's no activation. You mean the card system is just transmitting information to the payment processor? So the card system is the totality of the POS device through the transaction processor to the processing hub with its two databases. And the purpose here in Claim 32, and it's very different than the other claims in the companion case, only requires you to be able to use that debit multifunction card and basically to have those transactions processed. Therefore, these are very different issues. For use in the card system here is only to process a payment transaction. And to do that, all they need is the BIN over the banking network. And rather than just... I know I'm running out of time again, and I appreciate that. You're way out of time, so please... If I could direct you just to pages 19 to 22 of our gray brief. I disagree with my colleague with respect to the nature of the testimony that's been induced, and I think that you can see that there. But I'm grateful for your time. Thank you. We thank both sides. The case is submitted.